**W. C. GATEWOOD, Individually and for and on Behalf of All Residents, Voters and Taxpayers of the Commonwealth of Kentucky, Appellants,**

v.

**Robert MATTHEWS, Attorney General of the Commonwealth of Kentucky, and Thelma L. Stovall, Secretary of State of the Commonwealth of Kentucky, Appellees.**

Court of Appeals of Kentucky.

May 31, 1966.

William E. Johnson, Johnson & Burton, Frankfort, for appellants.

Robert C. Carter, Louisville, amicus curiae.

Robert Matthews, Atty. Gen., H. N. McTyeire, Asst. Atty. Gen., Frankfort, Morton Holbrook, Sandidge, Holbrook, Craig & Hager, Owensboro, for appellees.

WILLIAMS, Judge.

W. C. Gatewood, individually and for all residents, voters and taxpayers of the Commonwealth of Kentucky, brought this suit in the Franklin Circuit Court demanding a declaration of rights and seeking to enjoin the Attorney General and the Secretary of State from certifying the question of adoption of a proposed Constitution. The Franklin Circuit Court delivered a well reasoned opinion defining the rights of the appellant and those he represents, and declined to issue an injunction. This appeal results.

By amendment to KRS 7.170, the 1964 General Assembly established the "Constitution Revision Assembly" to carry on a program of study, review, examination and exposition of the Constitution of Kentucky, to propose and publish drafts, amendments, or revisions thereof, and to report the result of its work to the General Assembly. Pursuant to that mandate, a Constitution Revision Assembly was appointed by majority vote of the Governor, Lieutenant Governor, Speaker of the House, and Chief Justice of the Court of Appeals. The Assembly was composed of all former living Governors, one delegate from each of the 38 Senatorial Districts, and five delegates from the State-at-large. The Assembly conducted detailed studies on each section of the Constitution. At the conclusion of its labors it recommended to the 1966 General Assembly a draft of a reformed Constitution.

In 1966, the General Assembly passed Senate Bill 161, which submits to the voters at the general election on November 8, 1966, adoption or rejection of the Constitution prepared by the Constitution Revision Assembly. S.B. 161 requires publication of the proposed Constitution in at least two newspapers of general circulation published in Kentucky, once not less than ninety days before and once not less than seven days before the date of the election. It further directs the Attorney General to cause "the proposed Constitution and sched-

ule or summaries thereof to be further publicized by other communication media in order that the voters of the Commonwealth may have a reasonable opportunity to become informed on the issue to be decided by them."

The primary question to be considered is whether by the terms of Sections 256 and 258 of the Constitution the people have imposed upon themselves exclusive modes of amending or of revising their Constitution.

Section 258 authorizes the General Assembly to enact a law at two successive sessions providing for taking the sense of the people as to the necessity and expediency of calling a convention for the purpose of revising the Constitution. Section 256 provides for the proposal of amendments to the Constitution by the General Assembly.

It is the appellant's contention that those sections do represent exclusive modes of reforming the Constitution. He points out that in each of the former constitutions of this Commonwealth there has been a section which established procedure for revision. (Article XI, 1792 Const.; Article IX, 1799 Const.; Article XII, 1850 Const.; and sections 256–263, 1891 Const.) It is his argument that whatever power the Constitution has conferred upon the legislature in reference to proposing amendments or other modes of revision must be strictly pursued.

This is the first time this Court has had before it the question of whether sections 256 and 258 provide exclusive modes for changing the Constitution. In several cases we have considered efforts to amend or revise the Constitution in compliance with one of those sections. In each case this Court has held that such effort must follow precisely the procedure established in that particular section. Harrod v. Hatcher, 281 Ky. 712, 137 S.W.2d 405 (1940); Arnett v. Sullivan, 279 Ky. 720, 132 S.W.2d 76 (1939); McCreary v. Speer, 156 Ky. 783, 162 S.W. 99 (1914). In no case have we held that sections 256 and 258 are the exclusive modes of changing the constitution.

Here the proposed procedure does not follow the dictates of section 256 or 258 of the Constitution. In fact, there is no section specifically setting out the mode of revision prescribed in S.B. 161. If there be authority for such action it must be derived from the sovereign power of the people as delineated in section 4 of the Bill of Rights:

"All power is inherent in the people, and all free governments are founded on their authority and instituted for their peace, safety, happiness and the protection of property. For the advancement of these ends, they have at all times an inalienable and indefeasible right to alter, reform or abolish their government in such manner as they may deem proper."

These words were supposedly penned by Thomas Jefferson as section 2, Article XII, of the 1792 Constitution. In any event they express the historical experience of the people in securing a government in which they have freedom of action not permitted by "the Divine Right of Kings." They simply and forcefully state the doctrine of popular sovereignty. The doctrine was recognized in Miller v. Johnson, 92 Ky. 589, 18 S.W. 522, 15 L.R.A. 524 (1892), where it was said:

"It is conceded by all that the people are the source of all governmental power; and, as the stream cannot rise above its source, so there is no power above them. Sovereignty resides with them, and they are the supreme law-making power. Indeed, it has been declared in each of the several constitutions of this state that 'all power is inherent in the people;' and this is true, from the very nature of our government. * * *"

The Bill of Rights has always been recognized as the supreme law of the Commonwealth. That fact is emphasized by section 26 of the Constitution, which is carried over from the past constitutions:

"To guard against transgression of the high powers which we have delegated,

We Declare that every thing in this Bill of Rights is excepted out of the general powers of government, and shall forever remain inviolate; and all laws contrary thereto, or contrary to this Constitution, shall be void."

█ It is inconceivable to assume the people might be divested of the power to reform their government by the procedures established in sections 256 and 258 of the Constitution. Nowhere is that power limited either expressly or by necessary implication. In fact, one portion of a resolution offered at the 1890 Convention is as follows:

"Resolved, That the Constitution shall not be altered, amended or changed in any way except as provided in this article."

Vol. I, Debates, Constitutional Conventions, 1890, p. 144.

It was not adopted. The power of the people to change the Constitution is plenary, and the existence of one mode for exercising that power does not preclude all others.

History shows there were popular ratifications of both the 1850 and 1891 Constitutions despite the lack of provision therefor. Miller v. Johnson, supra. The legislative limitation that a constitution adopted by a convention should not become effective until ratified by a vote of the people was upheld in Gaines v. O'Connell, 305 Ky. 397, 204 S.W.2d 425 (1947), where we said:

"The challenge of this limitation upon the Convention, if one should be held, is that the constitutional provisions with respect to this mode of revision deal with every phase of the calling, organization and duties of a convention, and contain no authority for the General Assembly to bind the members to submit their work to a vote of the people. Hence, it is argued, the framers of the present constitution did not intend to confer upon the Legislature the power to restrict or limit the action of the convention."

\*    \*    \*    \*    \*    \*

"Since the constitution of Kentucky \* \* \* contains no inhibition or restriction upon the General Assembly in this matter of initiating a call for a Constitutional Convention, it was at liberty to exercise its plenary power in attaching the condition to the submission of the question of calling a convention. When they vote upon it, they will do so with the assurance that the result of the deliberations of the Convention, if called, will be submitted to them for ratification or rejection. By this course, the people keep a firm hold upon their liberties and may obtain a charter of government wanted by the majority." \* \* \*

And in Chenault v. Carter, Ky., 332 S.W. 2d 623 (1960), we held that the legislature was not prohibited from limiting a convention to consideration of only twelve subjects.

In a landmark opinion the Supreme Court of Rhode Island reversed a former opinion which applied the rule "expressio unius est exclusio alterius," in holding the amendatory language of their constitution was the exclusive mode of revision. In Re Opinion To The Governor, 55 R.I. 56, 178 A. 433 (1935). Their constitution provided that the people had a right "to make and alter their constitutions of government" by any "explicit and authentic act of the whole people." That Court approved an act of the General Assembly calling for a convention, although no such procedure was provided in the constitution. The Court said:

"The power granted to the General Assembly by article 13 can naturally and reasonably be viewed as an *additional* rather than an exclusive power, and the recognized rule is that if two constructions of a constitutional provision are reasonably possible, one of which would diminish or restrict a fundamental right of the people and the other of which would not do so, the latter must be adopted. \* \* \*"

The people of Georgia voted approval of a constitution submitted by their General

Assembly in 1945. The Bill of Rights of the Constitution of Georgia, Article I, section 5, provided:

"The people of this State shall have the inherent, sole and exclusive right to regulating their internal government and the police thereof, and of altering and abolishing their Constitution whenever it may be necessary to their safety and happiness."

The Supreme Court of Georgia, in Wheeler v. Board of Trustees, etc., 200 Ga. 323, 37 S.E.2d 322 (1946), held that the sections of the Georgia Constitution providing different modes of changing the Constitution did not limit the sovereign power of the people to approve the Constitution submitted to them by the General Assembly, and it further held that it is the vote of the people that gives life to the Constitution. The language used by that Court in upholding the doctrine reposing sovereign power in the people, is as follows:

"We now consider whether the instrument is valid as a new constitution. The constitution of 1877, article 13, section 1, paragraph 2 (Code, § 2–8602), provides as follows: 'No Convention of the people shall be called by the General Assembly to revise, amend or change this constitution, unless by the concurrence of two-thirds of all the members of each house of the General Assembly. The representation in said convention shall be based on population as near as practicable.' It is contended that this provision means that a completely revised or new constitution can be formulated by a convention, and in no other manner. We are now dealing with a written constitution—the original law by which our system of government was set up. It creates the government. By its provisions the three branches of our government—legislative, executive, and judicial—are created. The three branches of government must look to it for all their power and authority. Not so with the sovereign power, the people. Under our system of government all power and authority is vested in the sovereign people, subject only to such limitations as they have expressly imposed upon themselves by this organic law, the constitution. With this as the basis from which we reason, is it true that this provision of the constitution of 1877 limits the power of the sovereign people to a convention as the only means by which they can have a completely revised or new constitution? The language does not say so. The section purports to do nothing more than to place limitations upon the legislative branch of government as to the manner in which a convention can be called by this branch of the government. If we should say that the sovereign people themselves can adopt a new constitution by the convention method only, we would by implication be writing into this clause of the constitution a limitation on the sovereign power of the people. We do not hesitate to say that a court is never justified in placing by implication a limitation upon the sovereign. This would be an unauthorized exercise of sovereign power by the court. * * *"

In the ultimate sense, the legislature does nothing unless and until the people ratify and choose to give the revised constitution life by their own direct action. In this respect the legislature merely performs the role of messenger or conduit. The process is no more than corollary to the right of petition and address reserved to the people in section 1 of the Constitution.

We cannot accept the proposition that section 4 has been preserved throughout all these years as a mere relic, a museum piece without meaning or substance as a viable principle of free government. To the contrary, it seems clear to the majority of this Court that in each of our four constitutions the Bill of Rights has been purposefully set aside as supreme and inviolate because it represents those things that are basic and eternal, all other matters being transitory and subject to change. It fol-

lows that nothing else in the Constitution can be construed as a limitation, restriction or modification of any of these fundamental rights.

■ Each of the four constitutions of this state has provided a method or methods of amendment and revision. Significantly, in none of them have such specified procedures been declared exclusive. The reason is obvious. The right of each generation to choose for itself is inalienable, as it was recognized and said from the very beginning. Being thus inalienable, that right cannot be cut down or subjected to conditions any more than it could be completely denied by one generation to another. So long as the people have due and proper notice and opportunity to acquaint themselves with any revision, and make their choice directly by a free and popular election, their will is supreme, and it is to be done.

As a practical matter, the intent of the framers of the Constitution is more than satisfied by this proposed action. Section 258 directs that two sessions of the legislature provide for a vote by the people on calling a convention. Two sessions were apparently thought necessary adequately to inform the public of the impending election. Further, the right to vote for delegates assured the people of a voice through their elected representatives. Here the procedure goes even further. News and information are disseminated faster and more efficiently today than was anticipated when the Constitution was drafted. But even more significant is the fact the people need not rely on a representative to speak for them. They participate directly and individually. Each person may cast his vote for or against the adoption of the proposed constitution knowing full well what it says. Another thing of significance is that until he casts his vote the document is as nothing. Only a majority vote of the people can give it force and effect.

■ The question to be submitted to the voters is set out in S.B. 161, as follows:

"Are you in favor of reforming the Constitution of the Commonwealth to cause same to be in the same form and language as finally submitted to the Governor and the General Assembly of Kentucky by the Constitution Revision Assembly and set forth in Senate Bill No. 161 enacted at the Regular Session of the General Assembly of Kentucky held in the year 1966 and as heretofore scheduled and published as required by law?"

Suffice it to say the question conforms to the requirement of the statute, KRS 118.-170(3), and affords an intelligible opportunity to the voters to express a clearly defined preference. Turner v. Board of Education of Scottsville Independent School Dist., Ky., 266 S.W.2d 321 (1954); Armstrong v. Fiscal Court of Carter County, 162 Ky. 564, 172 S.W. 972 (1915); Stone v. Gregory, 110 Ky. 492, 61 S.W. 1002 (1901).

■ S.B. 161 provides that the complete text of the reformed Constitution shall be published in at least two newspapers of general circulation in the Commonwealth; once not less than ninety days before and again not less than seven days before the election. In addition, the Attorney General is directed to cause the proposed Constitution and schedule or summaries thereof to be publicized by other communication media. There is nothing vague or uncertain about the mandatory publication of the proposed Constitution, and the Attorney General's honorable and full compliance with the legislative direction must be expected and is to be presumed. To anticipate otherwise would constitute an unwarranted excursion outside the scope of judicial authority both as an intrusion upon the executive function and an invasion of that shadowy area where no justiciable controversy resides. Combs v. Matthews, Ky., 364 S.W.2d 647 (1963).

■ The action taken by the legislature does not violate the form or the spirit of the Constitution of Kentucky or the Constitution of the United States. When the people vote on the proposed Constitution it will

be an expression of the inalienable right of the ultimate sovereign to reform the government. That right is guaranteed by Section 4 of the Bill of Rights, and is not preempted by the inclusion in the Constitution of alternate modes of revision.

The judgment is affirmed.

HILL, J., dissented.

MILLIKEN, Judge (concurring).

I concur wholeheartedly in the majority opinion and think that the dissenting opinion ignores history, and dangerously tethers the present generation in the exercise of its greatest freedom, the freedom to alter or reform its basic law any time it deems proper. Furthermore, the dissenting opinion erroneously goes on the assumption that "[t]he proponents of the Act [S.B. 161] apparently contend that the legislature is 'the people.'" Nothing could be farther from the truth, for the majority opinion explicitly declares that the ultimate authority to make any change in the Constitution lies with the citizens of this Commonwealth, not the legislature.

It must not be forgotten that the language of the Bill of Rights is an attempt to express in words the specific achievements of the English and American peoples in their centuries-old struggle to establish the sovereignty of the people over the divine right of kings. The freedom they won was the freedom to participate in the affairs of their government and all that that implies, and in Kentucky they expressed that freedom in Section 4 of the Bill of Rights that " * * * they have at all times an inalienable and indefeasible right to alter, reform or abolish their government in such manner as they deem proper." It is the people who have that right, not the legislature; only the people have the final word. The legislature is one vehicle through which the people are given the chance to have that final word whether the submission of constitutional questions is done under the specific sections, 256 and 258, or under the Bill of Rights as here.

I view Sections 256 and 258 as means of effectuating the right of constitutional change the Bill of Rights assures, but I do not see those sections as limitations on the right of the people under Section 4 " * * * to alter, reform or abolish their government in such manner as they may deem proper." It is inconceivable to me that the generations which fought for and drafted the Bill of Rights celebrating their own freedom, would attempt to limit future generations in the means of maintaining and developing it.

The crucial problem for this Court is to protect at every stage the democratic process, the orderly and fair presentation to the people of any proposal pertaining to their basic law, and I think the method here employed is orderly, is in the open, and is as fair as any other method of presentation so far devised. This is an exercise in freedom and the majority opinion amply protects this generation of Kentuckians in the exercise of their freedom to change their basic law—to cope with the challenges of the present time. How the citizens exercise that freedom is entirely up to them.

HILL, Judge (dissenting).

I am not so much disturbed by the immediate result of this decision as I am by the establishment of a constitutional principle which is both contrary to logic and legal precedent and destructive to six sections (258–263) of the present Constitution of the Commonwealth of Kentucky.

The authors of our Constitution outlined in section 258 definite and specific steps for its revision. This is the one and only mode of revision contained therein. Had the authors intended any other mode of revision, they would have said so. Had they intended its revision in "any manner as they (the people) may deem proper," as is urged by appellees, section 258 would have been an indulgence in idle curiosity and speculation. I believe there is no rea-

sonable-minded person in this Commonwealth who doubts that it was the intention of the authors of the Constitution to provide an exclusive plan for revision.

It appears to me that the only justification for the majority opinion is expediency. The net result of the opinion recognizes the right of the legislature to repeal the Constitution either in toto or by piecemeal. Nowhere in the Constitution is the legislature given the authority to formulate or submit to the people a new constitution. Here we are testing a legislative act and not a process of revision of the Constitution. The legislature either has or does not have the authority to legislate on this important question.

The only source of power which appellees are able to invoke is section 4 of the Constitution. This section provides as follows:

"All power is inherent *in the people,* and all free governments are founded on their authority and instituted for their peace, safety, happiness and the protection of property. For the advancement of these ends, *they* have at all times an inalienable and indefeasible right to alter, reform or abolish their government in such manner as they may deem proper." (Emphasis added.)

On its face, this section is an expression of political philosophy. It is a cocky boast of a sovereign people revelling in the enjoyment of new-won freedom and sovereignty. It is said this philosophy came from the pen of Jefferson. Appellant argues it only has historic value. I would not degrade it on that theory but would recognize that it may well leave in "the people" a residual power to accomplish ends not otherwise provided for in the Constitution. It should be recognized, however, that the practical application of this section is almost impossible. It provides no plan of implementation. Who are "the people?" Certainly, they are not the legislature. Under this section how do "they" (the people) act? I point out these difficulties in section 4 simply to emphasize the general, broad,

and vague nature of the reservation of power contained therein and to further emphasize the utter dependence of section 4 upon section 258 for its implementation.

Without explaining just why section 4 empowers the legislature to pass the Act before us, the appellees rely upon section 26 of the Constitution. In doing so, they remove the trapdoor of their own scaffold. Section 26 is as follows:

"To guard against transgressions of the high powers which we have delegated, We Declare that everything in this Bill of Rights *is excepted* out of the general powers of government, and shall forever remain inviolate; and all laws contrary thereto, or contrary to this Constitution shall be void." (Emphasis added.)

Appellees cite this section to bolster their argument that section 4 of the Bill of Rights takes precedence over other sections. Ignoring the fact that this is contrary to settled principles of constitutional construction and contract law, the majority decision seems to overlook exactly what section 26 provides. Insofar as we are concerned in this case, it provides in effect that the power granted by section 4 "is excepted out of the general powers of government." In other words, the power exercisable by the people cannot be exercised by the government.

It cannot be successfully argued that the legislature in passing the Act before us was not exercising the general powers of government. The legislature has undertaken to preempt the right of the people which is reserved to them by section 4. This is exactly what section 26 says the government, acting through its legislature, cannot do. The case for appellees completely falls. Section 4 gives the legislature no authority to do anything. The argument might well stop here.

The proponents of the Act apparently contend that the legislature is "the people." I consider this argument untenable. But if the proponents are correct in this contention

and the legislature is vested with the unrestricted power ostensibly bestowed by section 4, then the provisions of the Constitution pertaining to revision are completely meaningless and useless. On this theory, the legislature could from time to time alter or reform the Constitution in any manner it saw fit to suit the varying and unpredictable winds of political philosophy. What becomes of the sections on revision? Has this court been usurping the power of the legislature for generations by declaring legislative acts unconstitutional?

The truth is, "the people" spoke when they enacted and adopted the Constitution of the Commonwealth of Kentucky. Until "they" speak again, the legislature exercising the general powers of government must conform to the plain mandates of that document.

Section 258 of the Constitution clearly recognizes that the legislature is not "the people." It specifically provides for taking "the sense of the people" with respect to revising the Constitution. To accept the theory that the legislature is "the people" (with plenary power reserved by section 4) would lead to the most frightening results. If section 258, relating to revision, is not binding on the legislature, then certainly section 256, relating to amendments, is not. Section 256 is no more exclusive than section 258.

If the legislature is "the people," then, of course, there is no necessity for having the vote of "the people" on any particular proposition. Those defending the Act seem to sense that somewhere, somehow the people should have a right to vote specifically on a constitutional revision or amendment, but their basic argument makes unnecessary any such vote. Nothing in section 4 requires any such vote. If the legislature had the authority to enact this law under section 4, then the vote of the people is mere surplusage.

In the argument, those defending this Act were forced to frankly concede that if a new Constitution could be adopted in this manner then the legislature itself could write the document. This is obviously true, and the majority of the court must accept this fact. This being so, the present safeguards for the revision or amendment of the Constitution are now obviously discarded and obsolete.

Be it remembered for all time to come that the *new* Constitution contains specific provisions for the revision and amendment of that document (Article XIV). Under the majority decision these provisions are nothing more than suggested methods of accomplishing those ends. They can be ignored by the legislature. I wonder if "the people" who will vote on the new Constitution will realize that the solemn methods of revision and amendment therein contained are little more than camouflage and that the legislature is in no way bound by them.

There are other reasons why the majority decision violates principles of constitutional construction as well as contract law, such as the well-settled rule that specific will take precedence over general. It is said in 16 Am.Jur.2d, Constitutional Law, section 26, p. 198, that:

" * * * the rule is that the constitutional mode of making amendments is mandatory and exclusive, and must be substantially followed, and that an amendment does not become effective as such unless it has been duly adopted in accordance with the provisions of the existing constitution. It follows that whatever power a constitution has conferred on the legislature in reference to proposing amendments, as well as to calling a convention, must be strictly pursued."

 * * * * * *

"Any attempt to revise a constitution or adopt a new one in any manner other than that provided in the existing instrument is almost invariably treated as extraconstitutional and revolutionary. Thus, even if the vote of the people should be overwhelming in adopting a constitution formulated by a convention not legally

called, it would be the duty of the executive and judiciary and all officers sworn to support the old constitution to resist to the utmost the installation of government under the new revolutionary constitution."

On the question of rules of construction of constitutional language, this court in Grantz v. Grauman, Ky., 302 S.W.2d 364, 366 (1957), stated:

"A cardinal rule is that where the language of the Constitution leaves no doubt of the intended meaning of the section under consideration, courts may not employ rules of construction. * * * Another important rule is that in construing one section of a Constitution a court should not isolate it from other sections, but all the sections bearing on any particular subject should be brought into consideration and be so interpreted as to effectuate the whole purpose of the Constitution."

Also in the early case of Varney v. Justice, 86 Ky. 596, 600, 6 S.W. 457, 459 (1888), in the same vein it is written:

"Wherever the language gives a direction as to the manner of exercising a power, it was intended that the power should be exercised in the manner directed and in no other manner. It is an instrument of words granting powers, restraining powers, and reserving rights. These words are fundamental words, meaning the thing itself; they breathe no spirit except the spirit to be found in them. To say that these words are directory merely, is to license a violation of the instrument every day and every hour. To preserve the instrument inviolate we must regard its words, except when expressly permissive, as mandatory, as breathing the spirit of command."

Perhaps the most celebrated and quoted case on the constitutional question involved here is Miller v. Johnson, 92 Ky. 596, 18 S.W. 522 (1892). I quote from Miller:

"If a set of men, not selected by the people according to the forms of law, were to formulate an instrument and declare it the constitution, it would undoubtedly be the duty of the courts to declare its work a nullity. This would be revolution, and this the courts of the existing government must resist until they are overturned by power, and a new government established."

\* \* \* \* \* \*

"If it provides how it is to be done, then, unless the manner be followed, the judiciary, as the interpreter of that constitution, will declare the amendment invalid."

Not only is the rule herein discussed firmly established in this jurisdiction, but in others, such as Indiana. See Ellingham v. Dye, 178 Ind. 336, 99 N.E. 1. In Ellingham, supra, the factual situation, as well as the constitutional provisions, was peculiarly similar to our own. In that case, the Legislature of Indiana passed a bill termed "proposed new Constitution." The Supreme Court of Indiana declared the bill unconstitutional, and the United States Supreme Court dismissed a writ of error. I am mindful of the Georgia case which furnishes strong support for appellees, but I consider the Georgia case, like the present one, a case of expediency.

The Constitutional rules of construction pertaining to this Act may not be understood by the layman. However, they are readily apparent to the trained legal mind. Those ardent supporters of a new constitution, and there is need for improvement, may become impatient and demand a short cut to a new constitution. But the Constitution of this Commonwealth should not be circumvented or a section or syllable masticated in the interest of expediency.

However unpopular my position, and irrespective of the loneliness of my dissent, I consider it my duty to speak out in support of the sacred and solemn Constitution of this Commonwealth and in support of the rights of "the people" who to this good hour have had no opportunity to be heard.